UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN E. DIAS,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>JO ANNE B. BARNHART, Commissioner<br>of Social Security,<br><br>　　　　　　　Defendant. | 1:05cv1394 DLB<br><br>ORDER REGARDING PLAINTIFF'S<br>SOCIAL SECURITY COMPLAINT |

**BACKGROUND**

Plaintiff John E. Dias ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

**FACTS AND PRIOR PROCEEDINGS**[2]

Plaintiff filed his application for disability insurance benefits on March 17, 2003, alleging disability since February 21, 2003, due to "severe brain damage from accident, lost eardrum

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On April 13, 2006, the action was reassigned to the undersigned for all purposes.

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

which affects equilibrium and balance, impaired vision, impulse control problems." AR 56-58, 70-79.  After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 37-40, 43-46, 47.  On November 1, 2004, ALJ James Berry held a hearing.  AR 436-494.  On November 26, 2004, ALJ Berry determined that Plaintiff was not disabled.  AR 15-25.  On September 9, 2005, the Appeals Council denied Plaintiff's request for review.  AR 4-7.

Hearing Testimony

ALJ Berry held a hearing on November 1, 2004, in Fresno, California.  Plaintiff appeared with his attorney Allan P. Cohen.  Vocational expert ("VE") Jose Chaparro also appeared and testified.  AR 436.

Plaintiff was 57 years old at the time of the hearing.  He completed one and one half years of junior college.  He is married and has two grown children.  AR 440.  Plaintiff last worked in 2003 as a truck driver.  AR 440.  He was fired after only two or three weeks because he had two accidents and became uninsurable.  He had numerous trucking jobs over the prior year, but lost them all.  AR 441.  He got upset and walked out, and he was once fired for trying to throw a person into a machine.  He would tell off his supervisors if he thought they were wrong and he stayed away from his coworkers.  AR 442.  Plaintiff also operated machinery for seven years, but got laid off.  AR 443.

Plaintiff testified that he has no eardrum on the right side and double vision in his right eye.  AR 447.  He has no depth perception in his left eye.  AR 448.  He drives periodically, but has to turn his head to see oncoming cars.  AR 448-449.  His depth perception problem began after an accident in 1983.  He has balance problems that come and go.  The right side of his face has been paralyzed since the accident.  He also has been more impatient and irrational.  He gets headaches almost every day.  He has pain in his foot, back and head.  AR 449-450.

Plaintiff explained that he has problems with impulse control and that he doesn't like people.  The Veterans' Administration ("VA") tried to send him to anger management classes, but Plaintiff refused because he didn't think he needed them.  AR 452.

He has degenerative disc disease in his back and his lower back hurts all the time. AR 454. He takes medication that helped the pain in the beginning, but he still has pain. AR 454. He also has arthritis in his shoulders and hands that affects his reaching and causes his hands to cramp. AR 455. Plaintiff has hepatitis C which causes him to be tired all the time. AR 456. The doctors have been talking about Interferon treatment for almost two years, but have not started him on it yet. AR 457. Plaintiff said his therapist didn't think he could handle the treatment because of his personality and mental attitude. AR 458. He is depressed and has thought about suicide. AR 459-460. He is angry and feels like hurting people everyday. AR 460. He has flashbacks from the war, but ignores them. AR 462. He attacked his wife in his sleep. AR 462. He has trouble with his memory and has trouble sleeping. AR 464.

Plaintiff also has trouble with his foot and has pain for which he receives injections. The pain resolved but is returning. AR 478. Without the injection, by the time he walked from the bed to the kitchen, he'd be in pain. He estimated that he could sit for about 15-20 minutes before needing to get up. AR 469.

During the day, Plaintiff watches television and tries to entertain himself. AR 465. He goes to his mother's house to see if she needs anything and to help out around there. AR 465. Plaintiff goes to the VA for counseling and group therapy. AR 465. Plaintiff's wife cleans the house because she doesn't like the way Plaintiff cleans. AR 467. She also does the laundry and cooking. AR 468.

Plaintiff told the ALJ that if could get a long with his coworkers, he would still be able to do that job. AR 471. Some of his medications cause him to be tired, but if he fights it, he can stay awake. AR 474. He could not estimate the time he could stand in an eight hour day, but thought he could walk about 10-15 feet before his feet start hurting and could walk another 10-15 feet after a rest. AR 477. His doctors tell him he can lift about 10 pounds, but he thinks he can lift more. AR 479.

The VE described Plaintiff's past jobs as tractor trailer truck driver, semi-skilled, medium work, and machinist, skilled medium work. AR 485.

For the first hypothetical, the ALJ asked the VE to assume an individual of Plaintiff's age, education and past relevant work. This person could lift and carry 100 pounds occasionally, 50 pounds frequently, can stand, sit and walk for six hours each, and perform two and three-step job tasks. This person could maintain attention, concentration, persistence and pace, and could relate to others and interact with others, but could have little contact with the public. This person could adapt to usual changes and adhere to safety rules, but this person must avoid consistent exposure to loud noise. AR 486. This person could not perform Plaintiff's past relevant work, but could perform the positions of truck driver helper, caretaker, and sales route driver. AR 487.

For the second hypothetical, the ALJ asked the VE to assume an individual with the RFC to lift and carry 10 pounds maximum, sit less than four hours, and stand and walk for less than four hours. This person would have difficulty relating to and interacting with others, and difficulty maintaining attention and concentration. This person would have difficulty adapting to usual changes in the work setting. AR 487. This person could not perform Plaintiff's past relevant work or any other position in the national economy. AR 487-488.

Plaintiff's attorney asked the VE if a person who had trouble with balance and walking in a straight line could perform the positions identified. The VE indicated that the person could not perform the position of truck driver helper or caretaker. If the person had trouble with double vision, he could still perform the position of truck driver helper. If this person had headaches 40 to 50 percent of the time and could not concentrate as a result, he could not perform the position of truck driver helper. If this person had balance problems, vision problems and headaches that affected concentration, he could not perform any of the jobs identified. AR 490.

If this person had anger management problems and was argumentative with people and coworkers, fearful and apprehensive, he could not perform any of the positions identified or any other position in the national economy. AR 492-493.

Medical Record

Plaintiff was treated through the VA beginning in 2002. He was treated for a hand injury, bladder obstruction and skin cancer. AR 148-374. The record reveals that Plaintiff also has Hepatitis C, but has never received treatment. AR 336.

In July 2002, Plaintiff was referred for psychiatric consultation at the VA and assessed for post-traumatic stress disorder ("PTSD"). AR 234.

On June 14, 2003, Plaintiff saw Emanuel Dozier, M.D., for a consultive examination. His chief complaint was a brain injury with chronic impaired balance and double vision. Plaintiff explained that in 1983, he was in a motorcycle accident during which he was thrown from his motorcycle and struck on the head, sustaining three skull fractures. Plaintiff indicated that he had learned to compensate for his double vision and balance problems. Upon examination, Plaintiff kept his head tilted to the right to allow focusing of his right eye. His right ear canal was sealed shut. His back was normal, but there was evidence of osteoarthritic nodular deformities over the distal interphalangeal joints of the index fingers of both hands. Range of motion was normal in all joints, motor strength was 5/5 in the upper and lower extremities bilaterally, and grip strength was 5/5 bilaterally. AR 112-116.

Dr. Dozier diagnosed status-post skull fracture with concussion and cerebrospinal fluid leak in the right ear, and status-post removal and closure of the right tympanic membrane and canal with intermittent vertigo. He opined that Plaintiff would have no postural or manipulative restrictions, but would be limited in working on scaffolds, overhangs, climbing ladders, or working on incline planes. He could lift and carry 50 pounds occasionally and 20 pounds frequently. He could stand and/or walk for six hours and sit for six hours. AR 112-116.

On June 27, 2003, Plaintiff saw Charles House, M.D., for a psychiatric evaluation. Plaintiff reported that he had brain damage, is easily angered, has been depressed, doesn't sleep well, and can't keep a job because of his temper. He also reported that he showers, runs errands, does laundry and helps out at home. On mental status examination, his mood was depressed. His score on a mini-mental status examination revealed that his cognitive processing was intact with no evidence of an impairment in attention, concentration, and memory. Dr. House diagnosed depressive disorder, not otherwise specified, mild to moderate, without anhedonia, without psychotic features, but with infrequent suicidal thoughts, and personality disorder with antisocial features. He had a guarded prognosis for the depressive disorder and a poor prognosis for the personality disorder. Dr. House opined that he was not likely to improve

symptomatically during the next 12 months.  Plaintiff could perform simple and repetitive tasks, including two and three step problem resolution, and could perform more complex tasks.  He would not have difficulty accepting supervision and would not have difficulty interacting with coworkers or the general public.  He could maintain regular attendance and complete a regular workday.  AR 117-123.

On August 3, 2003, a State Agency physician completed a Psychiatric Review Technique form.  The physician opined that Plaintiff had mild limitations in activities of daily living and in maintaining concentration, persistence and pace.  He had moderate restrictions in maintaining social functioning.  AR 126-139.  This was affirmed on August 28, 2003.  AR 126.  In a Mental Residual Functional Capacity Assessment form completed the same day, the physician opined that Plaintiff was not significantly limited in most categories, but was moderately limited in his ability to interact appropriately with the general public and his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  AR 140-142.  This opinion was affirmed on August 28, 2003.  AR 142.

In August 2003, Plaintiff underwent a pulmonary function test due to his chronic bronchitis and long history of heavy smoking.  The results were consistent with moderate airflow obstruction.  AR 208-209.

In September 2003, he complained of depression, decreased concentration, decreased energy, anhedonia and insomnia.  He was given an anti-depressant and referred for a psychiatric assessment for possible treatment.  AR 207-208.

A CT scan of Plaintiff's head taken in September 2003 showed evidence of atrophy and post traumatic and post surgical changes.  AR 303-304.  A lumbar spine x-ray was also taken and revealed mild to moderate degenerative changes at L5-S1.  AR 302.  Plaintiff was given Toradol and Neurotonin for his complaints of back pain.  AR 54-55.

In December 2003, Plaintiff underwent a Compensation and Pension psychiatric examination at the VA.  The examiner diagnosed PTSD, alcohol abuse, in remission per patient, and a past history of cocaine, heroin, acid, Seconal and cannabis abuse.  The examiner noted that

the symptoms could also be caused by substance abuse, but it was very difficult to make this determination. AR 184-190.

In February 2004, Plaintiff underwent removal of a neuroma in his left foot. AR 290-291.

In October 2004, Plaintiff saw L.M. Nile, M.D., for complaints of irritability, anger, impatience, and "roadrage." He diagnosed PTSD, severe, major depressive disorder, recurrent, chronic, dysthymia and Hepatitis C. Plaintiff was instructed to continue his medications. AR 312.

On October 1, 2004, Plaintiff indicated that the symptoms associated with the neuroma in his left foot were returning since his injection six weeks ago. AR 312.

On October 15, 2004, Dr. Nile completed a Mental Impairment Questionnaire. Dr. Nile indicated that she had treated Plaintiff four times since February 2004, and that he has been diagnosed with PTSD, major depressive disorder, and dysthymia, with a GAF of 45. His prognosis was guarded. She indicated that Plaintiff's understanding and memory were moderately to markedly limited, that his sustained concentration and persistence were moderately to markedly limited, that his social interaction was mildly to markedly limited, and that his adaptation was moderately to markedly limited. Numerous work-related stressors would increase his level of impairment, and a routine, repetitive, simple entry-level job would exacerbate his symptoms. Dr. Niles further opined that Plaintiff's impairments would render him unable to complete a workday 3-4 times per month, that these limitations have lasted for 12 continuous months, and that these limitations began in April 1983. AR 375-380.

On October 27, 2004, Allen J. Middleton, Ph.D., also completed a Mental Impairment Questionnaire. He indicated that he has treated Plaintiff since July 2002 and that Plaintiff has PTSD and a cognitive disorder, not otherwise specified. His prognosis was fair to poor. Dr. Middleton opined that Plaintiff's understanding and memory were not significantly limited to moderately limited, that his sustained concentration and persistence were not significantly limited to markedly limited, that his social interaction was mildly to markedly limited, and that his adaptation was moderately to markedly limited. Dr. Middleton further opined that Plaintiff's impairments would render him unable to complete a workday 3-4 times per month, that these

limitations have lasted for 12 continuous months, and that these limitations began in March 2003.  AR 381-386.

ALJ's Findings

The determined that Plaintiff had the severe impairments of dysthymia and PTSD.  The ALJ further determined that Plaintiff's allegations regarding his impairments were not entirely credible.  Plaintiff retained the residual functional capacity ("RFC") to lift and carry 100 pounds occasionally and 50 pounds frequently, stand, walk or sit for six hours each in an eight hour workday, and perform two and three step job tasks.  Plaintiff could maintain attention, concentration, persistence and pace, relate to and interact with others but with little contact with the public, adapt to usual changes, and adhere to safety rules.  Plaintiff had to avoid exposure to consistent loud noises.  Based on the testimony of the VE, the ALJ determined that Plaintiff could perform work that existed in significant numbers in the national economy.  AR 23-24.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3] Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) has an impairment or a combination of impairments that is considered "severe" (dysthymia and PTSD) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) was unable to perform his past relevant work; but (5) retains the RFC to perform jobs that existed in significant numbers in the national economy. AR 23-25.

Plaintiff argues that (1) based on his RFC and the requirements for work in the Dictionary of Occupational Titles ("DOT"), the VE's testimony demonstrates that he cannot perform other work; (2) the ALJ improperly rejected the treating physicians' opinions; and (3) the Medical-Vocational Guidelines ("Grids") should be applied to find Plaintiff disabled.

///

///

---

[3] All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

9

# DISCUSSION

A.   Plaintiff's RFC and the DOT

Plaintiff contends that pursuant to the job descriptions in the DOT of the alternate jobs cited by the VE, his RFC does not allow for performance of these positions. Specifically, he argues that the DOT descriptions for the positions of truck driver helper, caretaker and sales route driver helper, which neither the ALJ nor the VE discussed, are beyond the RFC set forth by the ALJ.[4] Given the VE's testimony that Plaintiff could perform no other positions, he contends that reversal and an award of benefits is warranted.

Social Security Ruling 00-4p states that generally, occupational evidence provided by a VE should be consistent with the occupational information supplied by the DOT. Where there is an apparent conflict, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE to support a decision about whether the claimant is disabled. *See* SSR 00-4p. The ALJ may rely on the testimony of a VE over that of the DOT by determining that the explanation given by the VE is reasonable and provides a basis for doing so. *Id.*

Although the DOT raises a presumption as to the job classification, the presumption is rebuttable. *Id.; Terry v. Sullivan,* 903 F.2d 1273, 1277 (9th Cir.1990). The ALJ may rely on expert testimony that contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation. *Johnson*, 60 F.3d at 1435. Evidence sufficient to permit such a deviation may be either specific findings of fact regarding the claimant's residual functionality or inferences drawn from the context of the expert's testimony. *See Light v. Social Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997). For example, in *Johnson,* "there was persuasive testimony of available job categories in the local rather than the national market, and testimony matching the specific requirements of a designated occupation with the specific abilities and limitations of the claimant." *Id.* at 1435.

///

---

[4] In his reply, Plaintiff appears to argue that the DOT positions cited is his opening brief may or may not be the positions that the VE was referring to. However, as the DOT positions presented to the Court were (1) identified by Plaintiff himself; and (2) were an *exact* match to the positions described by the VE, it is certainly logical for the Court to rely on these DOT definitions.

*Caretaker*

Citing DOT 301.687-010, Plaintiff contends that the position requires "performing a variety of duties, often changing from one task to another of a different nature without loss of efficiency of composure," and more than a little contact with the public.

As to the variety of duties and the ability to change from one task to another, Plaintiff argues that the ALJ's finding that he is limited to two to three step job tasks precludes him performing this aspect of the position. However, the ALJ's finding means that Plaintiff can perform two to three step job tasks at one time, and certainly does not stand for the proposition that Plaintiff cannot efficiently move from one task to the next. In fact, the ALJ specifically found Plaintiff capable of maintaining concentration, persistence and pace and capable of adapting to usual changes. AR 22. Thus, contrary to Plaintiff's position, the ALJ's RFC finding does not prohibit Plaintiff from performing this aspect of the caretaker position.

Insofar as Plaintiff contends that the position requires more than a little contact with the public and that his RFC precludes this, his argument also fails. While the ALJ did find that Plaintiff must have little contact with the public, the DOT definition for caretaker does not indicate that more such contact is required. The caretaker position identified by the VE was specific to "domestic service," or house cleaner. AR 487-488. Certainly, Plaintiff would have no more than a little contact with the public in cleaning a private home, and the DOT definition is therefore not inconsistent with Plaintiff's RFC.

*Truck Driver Helper*

Citing DOT 905.687-010, Plaintiff contends that the position of truck driver helper exceeds his RFC because (1) it requires "performing repetitive work, or performing continuously the same work according to set procedures, sequence or pace;" and (2) the noise level is described as "loud."

While the ALJ noted that Plaintiff's ability to maintain social functioning, concentration, persistence and pace are moderately restricted, the ALJ nonetheless determined that Plaintiff

retained the capacity to maintain attention, concentration, persistence and pace.[5]  AR 22.  Thus, the actual RFC finding, which Plaintiff does not cite, is not inconsistent with the DOT description.

As to the noise level, an issue that Respondent fails to address, the DOT describes the noise level intensity as "loud."  The ALJ determined that Plaintiff had to avoid "consistent exposure to loud noise."  AR 22.  This, of course, appears to be a conflict.  While the RFC may not necessarily be inconsistent with the DOT description, the ALJ should have set forth evidence to support the departure from the DOT, if a departure was indeed warranted.  *Johnson*, 60 F.3d at 1435.  However, the error is harmless, at best.  *Batson v. Comm'r Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding an error harmless where it did not negate the validity of the ALJ's ultimate conclusion).  In addition to truck driver helper, the VE identified the positions of caretaker, of which there were 12,100 in California and 65,500 nationally, and sales route driver helper, of which there were 4,500 positions in California and 48,700 nationally.  AR 23.  Therefore, even if the position of trucker driver helper is not available to Plaintiff, the ALJ identified a sufficient number of other positions to carry his burden at step five.

*Sales Route Driver Helper*

Plaintiff contends that DOT 292.667-010 provides that the position of sales route driver helper requires a commercial license, and that based on his testimony that he lost his prior trucking position because he was no longer insurable due to numerous accidents, he is unable to obtain a commercial drivers' license.  However, even assuming that being a high risk to an insurance company is somehow relevant to Plaintiff's ability to perform the exertional and non-exertional aspects of the position, the VE explained that truck driver helper, a very similar position, involves "basically loading and unloading trucks, [not] actually driv[ing] the truck."  AR 489.  It is reasonable to assume that Plaintiff would not be driving in this position, either.  Moreover, the DOT says only that the driver helper "*may* drive to relieve driver."  Therefore,

---

[5] Although these findings may appear inconsistent, SSR 96-8p states that the "adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not RFC assessments but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process."

given the VE's description of the position, the ALJ was entitled to rely on the position as an alternate job available to Plaintiff.

Plaintiff also contends that the position requires more than limited contact with the public and requires the ability to perform repetitive work, or the same work continuously, according to set procedures, sequence or pace, both of which, according to Plaintiff, are beyond his RFC. Given the VE's description of the position, it does not seem to involve more than a little contact with the public, and given the ALJ's finding that Plaintiff can maintain concentration, persistence and pace, the description appears consistent with the RFC finding.

B.   Treating Physician Opinions

Next, Plaintiff argues that the ALJ improperly rejected the opinions of the treating mental health doctors, Dr. Nile and Dr. Middleton. Plaintiff specifically contends that the ALJ should have accepted the limitations set forth in the October 2004, Mental Impairment Questionnaires completed by Dr. Nile and Dr. Middleton.

It is true that the medical opinion of a claimant's treating physician is entitled to "special weight." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988); *Valencia v. Heckler*, 751 F.2d 1082, 1088 (9th Cir. 1985). Reliance on the opinion of the treating physician is based not only on the fact that he is employed to cure but also on his greater opportunity to observe and know the patient as an individual. However, a treating physician's opinion is not conclusive as to a physical condition or the ultimate issue of disability. *Magallanes*, 881 F.2d at 751, and *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). An ALJ may reject a contradicted treating physician's opinion on the basis of clear findings that set out specific, legitimate, reasons for the rejection. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A statement by a physician indicating a claimant is "disabled" does not mean that the Secretary will concur, absent review of medical findings and other evidence. 20 C.F.R. 416.927(e).

The ALJ reviewed the restrictive opinions of both Dr. Nile and Dr. Middleton. AR 19-20. He gave these opinions little weight for a number of reasons. The ALJ first explained that Plaintiff stated that he stopped working in 2003 due to his employer's inability to obtain insurance, and that if he could get insurance and not get into a disagreement, he would still be

able to do that job. AR 21, 471. Certainly, Plaintiff's own admission that he could still perform the position weighs heavily against the harsh limitations imposed by Dr. Nile and Dr. Middleton. *See Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (an ALJ is entitled to draw inferences logically flowing from the evidence).

The ALJ next explained that the consultive examiner determined that Plaintiff had no mental limitations that would preclude work activity. AR 21. Indeed, Dr. House determined that Plaintiff could interact with supervisors, coworkers and the public despite his personality disorder with antisocial features. AR 122-123. The ALJ further stated that Dr. House's limitations were based on claimant's responses during the evaluation, and that although Plaintiff reported difficulty with memory, when examined, he made no errors on the mini-mental status exam. AR 21, 119-123.

Finally, the ALJ noted Plaintiff's testimony as to his daily activities, which included doing chores at home and at his mother's house, driving his grandchildren to school, and performing some home repairs, as needed. AR 21. The ALJ also noted Plaintiff's admission that his medications help control his symptoms. AR 21. Insofar as Plaintiff contends that his daily activities cannot be used to discredit the treating physicians' opinions, a physician's opinion of "disability 'premised to a large extent upon the claimant's own accounts of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan v. Apfel,* 169 F.3d 595, 602 (9th Cir. 1999).

Accordingly, the ALJ provided specific and legitimate reasons for rejecting the opinions of Dr. Niles and Dr. Middleton.

C.      Use of the Grids

Finally, Plaintiff argues that the ALJ should have applied Medical Vocational Guideline Rule 202.06 or Rule 201.06 to find him disabled. In making this argument, Plaintiff makes numerous additional arguments concerning the RFC finding, his credibility, and inconsistencies in the ALJ's findings.

///

///

*RFC Finding*

Plaintiff believes that the ALJ should have found that his double vision was a severe impairment because he failed to cite evidence for his conclusion that Plaintiff's glasses compensate for the condition, and because Plaintiff's need to tilt his head to the right results in a significant postural limitation. Although the record contains evidence that Plaintiff compensates for his double vision by tilting his head, there is no evidence of a resulting limitation. Plaintiff told Dr. Dozier that he has learned to compensate for his double vision by keeping his head tilted to the right, which generally prevents the double vision. AR 113. On examination, Plaintiff maintained a right horizontal tilt of the head to allow focusing of his right eye. AR 113. Despite this observation, Dr. Dozier found that Plaintiff had no postural restrictions. AR 115. Nor did any other physician impose a related limitation. The RFC assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p.

The ALJ also noted that Plaintiff's glasses compensate for his double vision. Indeed, Plaintiff testified that he has a prism in his glasses, but that it needs to be updated "because the prism isn't doing anything now." AR 449. From this statement, the ALJ reasonably determined that when the prism is updated, his glasses will help correct his double vision. In finding his double vision non-severe, the ALJ also noted that Plaintiff was able to drive a truck for years despite this problem. AR 17. Plaintiff corroborated this finding when he testified that he could still perform the truck driving job if he could get along with others. AR 471. In determining whether an impairment or combination of impairments is "severe," an ALJ should carefully examine the medical findings that describe the impairments and make an "informed judgment" about the limitations and restrictions the impairment and related symptoms impose on the person's physical and mental ability to do basis work activities. SSR 96-3p. The ALJ did so here. The Court must uphold the ALJ's decision were the evidence is susceptible to more than one rational interpretation. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

Plaintiff also believes that the ALJ should have assessed limitations resulting from Plaintiff's mild to moderate degenerative changes in his lower back. The ALJ reviewed the

lumbar x-ray and noted Plaintiff's complaints of back pain, for which he was prescribed medication. AR 18-19. Despite Plaintiff's complaints, however, the ALJ explained that Plaintiff was able to perform numerous daily activities. Moreover, Dr. Dozier's examination revealed normal bulk and muscle tone in his back, with normal curvature and no trigger points or spasms. AR 114. Range of motion in his back was normal, and Plaintiff was able to ambulate with no signs of pain and sit during the interview without discomfort. AR 113. Neither Dr. Dozier nor any other physician imposed any limitations based on Plaintiff's back complaints. Based on this evidence, the ALJ reasonably determined that Plaintiff's back complaints did not have a significant impact on his ability to work.[6]

In a brief argument, Plaintiff also appears to contend that the ALJ should have included a limitation based on Plaintiff's pulmonary function test, which demonstrated moderate airway flow obstruction. AR 19. The ALJ reviewed this evidence, along with a September 2003 chest x-ray that showed minimal bilateral apical thickening but no active disease, and a May 2004 chest x-ray that showed no significant changes. AR 305, 364. An impairment does not necessarily result in limitation. It is Plaintiff's burden to provide evidence showing how his impairment affects his functioning, and he has failed to do so. 20 C.F.R. 404.1512(c).

*Inconsistencies in RFC Finding*

Next, Plaintiff contends that the ALJ's finding that Plaintiff was unimpaired in his ability to accept supervision and interact with the general public is inconsistent with Dr. House's finding that Plaintiff suffers from a personality disorder with anti-social features and that his prognosis was poor. AR 122. Again, Plaintiff appears to confuse a diagnosis with an actual limitation. In other words, just because Dr. House diagnosed Plaintiff with a personality disorder with anti-social features does not necessarily mean that Plaintiff has resulting limitations. The mere diagnosis of an impairment is not sufficient to sustain a finding of disability. *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985). In any event, contrary to Plaintiff's statement, the ALJ did

---

[6] As Respondent notes, even if the Court accepts the argument that Plaintiff could only perform medium work, the VE testified that Plaintiff could perform two positions that required medium exertion. AR 487.

accept Plaintiff's inability to have more than a little contact with the general public in making his RFC finding.  AR 22.

Insofar as Plaintiff contends that Dr. House's examination was invalid because he did not perform psychometric testing and failed to review Plaintiff's records, his argument is without merit.  Dr. House indicated that he reviewed records supplied by the SSA and took a thorough, detailed history from Plaintiff.  AR 117-119.  Dr. House performed a thorough mental status examination, including a mini-mental status examination of Plaintiff's intellectual functioning.  AR 119-122.  There is no indication that the examination was lacking in any way.  Dr. House's independent clinical findings constitute substantial evidence upon which the ALJ was entitled to rely.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

*Plaintiff's Testimony*

Plaintiff also argues that although the ALJ mentioned Plaintiff's testimony, he failed to reject it.

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints.  *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991).  In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir. 1988)).  Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.  *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).  "The ALJ may consider at least the following factors when weighing the claimant's credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789,

792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.*

Contrary to Plaintiff's argument, the ALJ provided numerous reasons for rejecting his testimony. The ALJ began his credibility analysis by stating that he considered the symptoms, including pain, and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, pursuant to 20 C.F.R. § 404.1529 and SSR 96-7p. AR 20. The ALJ then explained that Plaintiff's medications help with his anger and other ailments, and do not cause side effects. AR 20, 461. *Morgan v. Apfel*, 169 F.3d 595, 599 (9th Cir. 1999) (ALJ properly discredited claimant's subjective complaints by citing improvement with medication).

The ALJ next noted Plaintiff's daily activities, which included driving, watching television, visiting with his mother and helping her out, and doing chores. AR 20. The ALJ also noted that Plaintiff occasionally drives his grandchildren to school and makes necessary home repairs. AR 20. *See id.* (evidence that claimant was able to fix meals, do laundry, work in the yard and occasionally care for her friend's child discredited her allegations).

The ALJ further explained that although Plaintiff was involved in an accident in 1983 that resulted in some hearing and vision loss, Plaintiff has not been significantly limited by either of these impairments. AR 21. Although he claimed to have difficulty with double vision, he was able to work for many years as a truck driver with glasses that compensated for his problem. AR 21. *See Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (an ALJ is entitled to draw inferences logically flowing from the evidence).

The ALJ further noted that although testing revealed moderate airflow obstruction, there was no evidence that Plaintiff has stopped smoking. AR 21. Further, although Plaintiff testified that he has a very limited ability to sit, stand and walk, there was no objective medical evidence to support this allegation. AR 21. The ALJ therefore made a credibility determination with findings sufficiently specific to permit the Court to conclude that he did not arbitrarily discredit Plaintiff's testimony. *Thomas,* 278 F.3d at 958.

*Grids*

Plaintiff's final argument, that he should have been found disabled pursuant to application of Rule 202.06 or 201.06, can be disposed of quickly. It is based on the assumption that Plaintiff is limited to either light or sedentary work based on his testimony, but as described above, the ALJ properly rejected Plaintiff's testimony. Therefore, Plaintiff is not limited to light or sedentary work and neither Rule 202.06 nor Rule 201.06 has any application.

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Jo Anne B. Barnhart, Commissioner of Social Security and against Plaintiff, John Dias.

IT IS SO ORDERED.

**Dated:    August 28, 2006**                    **/s/ Dennis L. Beck**
3b142a                                                            UNITED STATES MAGISTRATE JUDGE